# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | ) | **NO. 1:07-CR-0286** |
| | ) | |
| **v.** | ) | **(Judge Caputo)** |
| | ) | |
| **GREGORY J. SALKO** | ) | **Filed Electronically** |

## GOVERNMENT'S RESPONSE  IN OPPOSITION
## TO DEFENDANT'S OMNIBUS MOTION IN LIMINE

Respectfully submitted,
MARTIN C. CARLSON
UNITED STATES ATTORNEY


 s/ Kim Douglas Daniel
KIM DOUGLAS DANIEL
ASSISTANT U.S. ATTORNEY
228 Walnut Street
Harrisburg, PA  17108
Phone: (717) 221-4482
Fax: (717) 221-2246
Kim.daniel@usdoj.gov
PA BAR #31038

# TABLE OF CONTENTS

Table of Authorities . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . iii

A.   SUMMARY OF THE MOTION  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

B.   ARGUMENT  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

    I.   The Government Should Not Be Precluded From Offering Exhibits That Have Not Yet Been Identified as Exhibits in its Case-in- Chief  As Of The Time Of Defendant's Motion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

    II.   Opinion Testimony From Unidentified Experts and Dr. Ross' Autopsy Report . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

    III.   The Highmark Medicare Services Witnesses  . . . . . . . . . . . . 5

    IV.   Medical Standard Of Care Testimony  . . . . . . . . . . . . . . . . . . 6

    V.   The County Charges and Salko's Ownership of Birch Hills . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

    VI.   The Medicare Notice of Review Results Letters . . . . . . . . . . 10

    VII.   Peggy Rogers' Death and Peggy Rogers' Mastectomy . . . . . 12

    VIII.   Opinion Testimony From Dr. Craparo . . . . . . . . . . . . . . . . . 15

    IX.   Salko's Medical License Suspension . . . . . . . . . . . . . . . . . . 16

    X.   Salko's Personal Life . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

    XI.   Statistical and Peer Rankings Evidence . . . . . . . . . . . . . . . . 17

    XII.   Improbable/Impossible Days . . . . . . . . . . . . . . . . . . . . . . . . 18

XIII.     Rogers' Hospital Photographs . . . . . . . . . . . . . . . . . . . . . . . . 23

XIV.    Suggestions that Salko Billed Medicare for Breast Exams . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

XV.     Suggestions That Electronic Medical Records Are Unreliable . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

XVI.    Salko's Overall Medical Care of Rogers and Patient X . . . . 25

XVII.   Rogers' and Patient X's Right to Receive Competent Health Care and Medicare Benefits . . . . . . . . . . . . . . . . . . . 26

XVIII.  Dr. Demario's August 29, 2006 Report Re Peggy Rogers . 27

XIX.    Government Exhibits 16 and 34 . . . . . . . . . . . . . . . . . . . . . . 28

XX.     Post- Salko Medical Care of Rogers and Patient X . . . . . . . 30

XXI.    Peggy Rogers and Patient X's Competency Prior to August 20, 2006 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

C.    Conclusion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

Certificate of Service

# TABLE OF AUTHORITIES

## FEDERAL CASES

United States v. Abel,
    469 U.S. 45 (1984) ........................................................................ 9, 11, 12, 17

United States v. Bray,
    139 F.3d 1104 (6th Cir. 1998) ...................................................... 30

United States v. Duncan,
    919 F.2d 981 (5th Cir. 1990) ........................................................ 29

United States v. Petty,
    132 F.3d 373 (7th Cir. 1997) ........................................................ 29

United States v. Pinto,
    850 F.2d 927 (2nd Cir. 1988) ...................................................... 29

United States v. Ringwalt,
    213 F. Supp. 2d 499 (E.D. Pa. 2002) .......................................... 17, 21, 22, 27

United States v. Syme,
    276 F.3d 131 (3d Cir. 2002) ........................................................ 29

United States v. Winn,
    948 F.2d 145 (5th Cir. 1991) ........................................................ 29

## GOVERNMENT'S RESPONSE IN OPPOSITION
## TO DEFENDANT'S OMNIBUS MOTION IN LIMINE

AND NOW, comes the attorney for the government, by and through Assistant United States Attorney Kim Douglas Daniel, who respectfully submits the Government's Response in Opposition to the Defendant's Omnibus Motion in Limine.

### A.    SUMMARY OF THE MOTION

By the filing of his 15th substantive motion in this case,[1] the defendant seeks an order which would effectively preclude the government from presenting little if any proof at his trial. Defendant's 30 page Memorandum in Support challenges 21 different categories of evidence and/or testimony. All of the defense arguments, however, lack merit and the Omnibus Motion in Limine should be denied.

### B.    ARGUMENT

#### I.    The Government Should Not Be Precluded From Offering Exhibits That Were Not Disclosed As Of The Time Of Defendant's Motion

Citing Rule 16(a)(1)(E) of the Rules of Criminal Procedure, the defense argues the government should be precluded from offering any additional documents, data, photographs or other tangible objects during trial that it had not disclosed as of the date of the filing of the Motion in Limine. Not surprisingly, Salko cites no case law

---

[1]Not counting motions for extension of time or continuances.

in support of his request. Defendant's interpretation of Rule 16 goes far beyond what it requires and the motion is meritless.

In addition to items material to the preparation of a defense and property belonging to the defendant, Rule 16(a)(1)(E) obligates the government to disclose those documents and objects, within its possession, custody and control, that "the government intends to use ... in its case-in-chief at trial." The Rule sets no time frame or deadline by which the government's must complete its process of identifying its case-in-chief exhibits. Nor does it dictate when the disclosure of those exhibits must take place.

Unlike the defense, the government has made a good faith attempt to comply with Rule 16 in this case. Shortly after the case was indicted, on September 14, 2007, the government provided the defense an exhibit list and 42 government exhibits. Thereafter, on September 30, 2008, more than a month before the scheduled start of this trial, the government provided the defense copies of 62 additional exhibits. *See* Attachment "A." That was followed by 12 more exhibits on October 8, 2008, and 4 more summary exhibits on October 14, 2008. *See* Attachments "B" and "C." Thus, more than 110 government exhibits have already been disclosed to the defense.

Compare the government's good faith adherence to Rule 16 with the track record of the defense in this case. Although Rule 16(a)(b)(1) imposes an identical,

reciprocal duty of exhibit disclosure upon the defense, to date the government has not received a copy of *one* exhibit the defense intends to use at trial.[2]

Identifying exhibits is an ongoing process that naturally intensifies as trial approaches. The selection process is often affected by pre-trial motions, such as the motions to exclude Rule 404(b) evidence, for bifurcation of trial, and for Daubert hearings in this case.  As counsel prepare for trial, review the evidence, and then re-review the evidence, the basis for new or different exhibits may come to light. Indeed, many exhibits, particularly summary exhibits, can not be finally prepared until after trial has commenced.  Rule 16 was never intended to preclude this evolutionary process and for that reason, does not impose inflexible or artificial pre-trial deadlines.   Accordingly, Defendant's motion to preclude the admission of additional government exhibits should be denied.

## II.   Opinion Testimony From Unidentified Experts and Dr. Ross' Autopsy Report

Here Salko argues the Government should be precluded from soliciting opinion testimony from any other unidentified expert witness besides Dr. Kass and Dr. Craparo during trial.  Salko also argues the government should be precluded from

---

[2]On October 8, 2008, the government received a CD Disk containing thousands of pages of investigative reports and other documents. However, not one document is identified as a Defense Exhibit.

3

soliciting opinions from Dr. Gary Ross, the pathologist who performed Peggy Rogers' autopsy, because his autopsy report does not constitute an "expert report" under Rule 16. Once again, Salko has grossly misinterpreted Rule 16 and its requirements.

Under Rule 16(a)(1)(G), the government must give the defense a "written summary of any testimony it intends to use under Rules 702, 703, or 705 *during its case in chief.*" (emphasis supplied). The summary "must describe the witnesses' opinions, the basis and reasons for those opinions, and the witnesses' qualifications." *Id.* Since by its very terms Rule 16(a)(1)(G) is limited to experts called during the government's case-in-chief, there is no obligation the government disclose potential, expert *rebuttal* witnesses. Thus, Salko's request to limit the government's opinion testimony during trial to Dr. Kass and Dr. Crapero should be denied.

More importantly, the government has fully complied with Rule 16 as it relates to Dr. Ross. More than 6 months ago, by correspondence dated March 4, 2008, the government advised it was calling Dr. Ross as an expert witness and provided the defense a copy of his *curriculum vitae.* The correspondence provided ...

> for purposes of the written summary required by Rule 16(a)(1(6)(sic),
> the government specifically incorporates Dr. Ross' Autopsy Report and
> advises he will testify to the opinions, as well as the basis and reasons
> for those opinions, set forth in his Report. Specifically, the government
> expects Dr. Ross to testify that in his opinion Peggy Rogers' cause of
> death was metastatic breast cancer.

4

Dr. Ross' December 29, 2006, Autopsy Report was disclosed to the defense nearly 6 month earlier on September 14, 2007. The 15 page Report, attached as Govt. Exh. # 44, more than satisfies Rule 16 in that it sets forth, in detail, the basis and reasons for Dr. Ross' opinions. Therefore, Salko's motion to preclude Dr. Ross' testimony should be denied.

### III.    The Highmark Medicare Services Witnesses

Here Salko argues the government should be barred from soliciting "opinions' from Medicare's agent, Highmark Medicare Services, regarding the propriety of the claims he submitted and his record-keeping procedures, or whether he actually performed the medical services he claimed to have rendered.

The Highmark witnesses will to testify to facts, not opinions. They will testify to Medicare provider qualifications and requirements, as well as Medicare billing, payment and auditing procedures. The witnesses will testify how a provider submits a Medicare claim, what information is contained within the claim, and what documents, including progress notes, constitute part of the claim even though the notes are not physically submitted to Highmark. The witnesses will also explain the use of CPT Procedure Codes and how each electronic claim is processed and paid. The witnesses will further testify to the thousands of claims submitted by Salko to Medicare for E &M services during FY 2005 and FY 2006. The witnesses will also

testify to the particular claims Salko filed for E&M services rendered to Peggy Rogers and Patient X. The witnesses will explain what representations were made in those claims, and when and why the claims were paid. Most importantly, the witnesses will be asked whether, under the rules and regulations established by Medicare, Highmark pays claims for E &M services when Highmark knows the supporting progress notes, which indicate physical examinations were conducted, are false and no examinations were performed. The answer, of course, is no.

This testimony, what Highmark does or doesn't do, is factual testimony, not opinion testimony. Contrary to Salko's misunderstanding, the witnesses will not be asked to express their views on whether Salko actually performed the services he claimed to have rendered or whether his claims were false or fraudulent. That determination is reserved for the jury. Thus, Salko's motion to preclude their testimony should be denied.

## IV.    Medical Standard Of Care Testimony

Salko urges the Court to preclude the government from soliciting medical standard of care testimony. Salko claims the testimony is irrelevant and should not be admitted in any phase of the trial, including the penalty phase.

To the contrary, medical standard of care testimony is clearly relevant in both phases of this trial. It is relevant in the guilt/innocence phase because it will help

explain the actions of a key fact witness, Dr. Thomas Craparo. Not satisfied with the level of care she was receiving from Salko, Patient X will testify she fired Salko and replaced him with Dr. Craparo on May 24, 2005. Dr. Craparo will testify that upon his first encounter with Patient X he immediately ordered a mammogram. Dr. Craparo took this action because his review of Patient X's chart at Highland Manor indicated she did not have a mammogram since her arrival at Highland Manor in December of 2003 and the universally recognized standard for women over the age of 50 is an annual mammogram.

Medical standard testimony is also clearly relevant in the penalty phase. The government has alleged in its Health Care Fraud Counts that Salko engineered a scheme that not only defrauded Medicare out of money but, more importantly, denied Peggy Rogers and Patient X an adequate level of medical care, resulting in serious bodily injury and death. Both Dr. Kass and Dr. Craparo will opine that Salko's failure to give Rogers and Patient X a mammogram or a clinical breast exam during the 24 months and 18 months, respectively, he served as their primary care physician fell below the universally recognized medical standard. The Doctors will further opine Salko's deviations from the standard of care increased their risk of serious bodily injury. Clearly, this is the type of expert, medical opinion testimony that will aid a jury in making an informed decision on the enhanced penalty issues. Thus, Salko's motion to preclude any and all medical standard testimony should be denied.

7

## V.    The County Charges and Salko's Ownership of Birch Hills

Salko argues the government should be precluded from soliciting any testimony about the Lackawanna County criminal charges that have been filed, not only against Salko but also against Vincent McGrath and Tom Brown. Brown, the former Director of Resident Services at Birch Hills, and McGrath, his former Supervisor there, pleaded guilty to Neglect of Dependent Person Care and Tampering with Evidence charges. Brown and McGrath admitted they conspired to alter Rogers' shower records at Birch Hills in an attempt to obstruct a Lackawanna County grand jury investigation. Citing Rule 609, Salko argues that evidence of their guilty pleas should not be admitted because they have not yet been sentenced and their convictions are not final.

Salko has adopted an unrealistically narrow interpretation of the term "conviction" under Rule 609. The only reason why Brown and McGrath have not been sentenced is because they both agreed to cooperate and testify against Salko on his state charges. Under Rule 607, the credibility of a witness may be attacked by any party, including the party calling the witness. Tampering with Evidence is a *crimin falsi* offense and under Rule 609(b)(2), evidence that a witness has been convicted of a crime "shall be admitted" if the elements of the crime require an act of dishonesty or false statement. Moreover, specific instances of conduct and extrinsic proof of

8

same to show potential *bias* in a witness is admissible pursuant to Rule 402. *United States v. Abel*, 469 U.S. 45, 51 (1984). "Bias" is defined as the relationship between a party to an action and a witness that might lead the witness to slant, unconsciously or otherwise, his testimony in favor or against the party. *Id.*, at 52. Because Brown and McGrath negotiated plea agreements that call for their cooperation and testimony against Salko, this information should not be withheld from the jury. Therefore, there is no reason why the Court should preclude evidence of their guilty pleas from trial.

Salko also requests that no testimony regarding Salko's ownership or affiliation with Birch Hills, or its license suspension, be admitted during trial. Salko cites no reason why the testimony should be precluded.

The Indictment alleges Salko owned, in whole or in part, both Whites Crossing and Birch Hills. Count 1, para. 3. The Indictment also alleges Salko concealed his scheme to defraud by causing his employees at those facilities to prepare false progress notes, to retain electronic versions in Whites Crossing's computer files, and to insert signed copies in Rogers' chart at Birch Hills. Indictment, Count 1, para. 18-20. Certainly then, Salko's ownership of Birch Hills and his dominion and control over Birch Hills employees is pertinent to the issues in this case. Accordingly, the Court should deny Salko's Motion in Limine along these lines.

## VI.    The Medicare Notice of Review Results Letters

Salko requests the Court bar the admission of two letters, a Preliminary and Final Notice of Review, sent to Salko by Medicare's agent, HGS Administrators, in December of 2000.[3]   Salko suggests the letters are inadmissible because they constitute hearsay, the government did not provide copies of patient records referenced in the letters, and do not relate to Peggy Rogers or Patient X.

The two letters, dated December 5 and December 20, 2000, respectively, are relevant and admissible in this case because they clearly placed Salko on notice as to the central issues in this case - the vital importance of creating and maintaining accurate medical records supporting Evaluation and Management (E & M) service claims.  The letters reported the results of Medicare's review of 61 claims for E & M services Salko provided to 15 patients between July of 1998 and June of 1999. The review found Salko had failed to adequately document some of his E & M claims, had repeatedly employed template language in his supporting progress notes, and determined Medicare was owed a refund.  The letters reminded Salko of his obligation to adequately document his claimed services, particularly as it related to

---

[3]HSG was Highmark Medicare Services predecessor and served as Medicare's claim processing agent during the time in question. Both letters were signed by a Medical Analyst in the Medical Review Section of HSG, one Corrine Lupold, LPN.

E & M services, and cautioned him about the use of template language in his progress

notes.  For example, the Preliminary Notice of Review provided:

> Congress and the Department of Health and Human Services (HHS)
> have authorized the Medicare program to seek all information necessary
> to support a claim for payment (p.2) ... (T)he requirements are that
> documentation must clearly show the service that was rendered, the
> extent to which it was rendered, and why the service was medically
> necessary (p.2) ... Documentation is a deciding factor in allowing,
> reducing or denying services (p.7) ... Medicare requires that patient
> records document every service for payment. (p.7) ...  Patient office
> records must show evidence that the service was actually provided; the
> service was rendered at the level reported; the service was medically
> necessary. (P.7) ... Documentation  must be clear and complete  (p.7).

Govt. Exh # 1 (emphasis supplied). With respect to billing for Evaluation and

Management Services, the letter specifically cautioned:

> Please be aware that the level of care must be assessed individually for
> each service rendered and must be supported individually by the
> documentation in the patient's records by the rendering physician  for
> the date of service billed.

*Id.*, p.8. The letter also enclosed 3 Educational Reports and Manuals dealing with

general medical record documentation guidelines and 3 Educational Reports and

Manuals dealing specifically with E & M service documentation guidelines. *Id.* p.

10.

The letters recommended Salko refrain from billing Medicare for services that

were insufficiently documented.  The letters also recommended  Salko refrain from

the use of template language in his supporting progress notes.  *Id.* Perhaps more importantly, the letters warned Salko he could be criminally prosecuted for submitting false claims to Medicare.

> *Services rendered to Medicare beneficiaries must be accurately described when claiming reimbursement from Medicare.* The Social Security Act, Section 1128 et seq., provides for  civil and *criminal penalties* for this and other situations.

*Id.*, p.2 (emphasis supplied).

Contrary to Salko's argument, the letters will be authenticated by an appropriate  custodian as records of regularly conducted activities under Rule 803(6). Thus, they do not constitute inadmissible hearsay.  The fact the government has not provided copies of the patient files referenced in the letters, records the defense already possesses, is irrelevant to their admissibility. Thus, they should not be precluded from trial.

### VII.  Peggy Rogers' Death and Peggy Rogers' Mastectomy

Salko argues that because the Court has bifurcated the trial with a separate penalty phase after the jury finds guilt on the substantive charges, the government should be precluded from offering any testimony regarding Peggy Rogers' death, Patient X's mastectomy, or their breast cancer diagnosis.  Such would unfairly and unreasonably limit the government' proof in its case in chief.

With respect to Patient X, evidence that she underwent a mammogram, a breast biopsy, that she was diagnosed with cancer, and underwent a mastectomy is vital to the government's ability to prove Salko falsified her progress notes. The Indictment alleges Salko inserted 3 sets of false progress notes into Patient X's chart at Highland Manor *after* he was replaced by Dr Craparo on May 24, 2005. These 3 progress notes, dated June 12, 2005, July 2, 2005 and July 17, 2005, are charged as Counts 17-19. Salko indicated in each and every note that he had "reviewed Patient X's chart" and all of her "consult reports, diagnostic reports, laboratory reports, procedure reports and radiology reports." On all 3 occasions Salko reported that Patient X was "DOING WELL TODAY, NO NEW COMPLAINTS OFFERED AT THIS TIME," or other words to this effect.

In reality, Dr. Craparo will testify Patient X was *not* doing very well at the time. Indeed, Patient X's chart at Highland Manor was replete with consult reports, lab reports, diagnostic reports, procedure reports, and radiology reports indicating she had a very serious medical problem. Patient X underwent a mammogram on June 2, 2005, the results of which were abnormal. Thereafter, Patient X underwent a breast biopsy on July 11, 2005. The biopsy report confirmed Patient X had breast cancer and she underwent a mastectomy on August 26, 2005. Thus, evidence that Patient X had a mammogram, was diagnosed with breast cancer, and underwent a mastectomy

is clearly relevant to the government's ability to prove Salko's progress notes are false and this evidence should not be excluded from the government's case-in-chief.[4]

Evidence of Peggy Rogers' metastatic breast cancer and death on November 4, 2006 is also extremely relevant to the government's case-in-chief. According to Salko's false progress notes (Counts 2-10), he gave Rogers 9 consecutive breast exams between May 21, 2006 and August 13, 2006. On each occasion Salko reported no abnormalities. However, a government expert, Dr. Rene Kass, will opine Salko's progress notes must be false because Rogers' tumor would have clearly been palpable upon the performance of any reasonably proficient breast exam on May 21, 2006.

Dr. Kass' palpability opinion is based upon several factors, including but not limited to the type of cancer Rogers had, its size at the time it was diagnosed, the fact the tumor had ulcerated through her skin, and the tumor's size at the time of death. In order to adequately explain her opinion to the jury, Dr. Kass will have to reference

---

[4]Salko's last false Patient X progress note, for an E & M service allegedly provided on July 17, 2007, indicates the report was printed July 20, 2005. However, it is unknown when Salko actually inserted the note into Patient X's chart at Highland Manor. Because it was not discovered there until early 2006, given his free access to Highland Manor, it is possible Salko did not insert the false progress note into Patient X's chart until sometime after her August 26, 2005 mastectomy.

14

data and information from Rogers' diagnostic mammogram, oncology results, and autopsy report. Thus, evidence of Rogers' metastatic breast cancer and death is clearly relevant and probative and should be admitted during the government's case-in-chief.

## VIII. Opinion Testimony From Dr. Craparo

Salko asks the Court to preclude the government from soliciting opinion testimony from Dr. Craparo during the guilt/innocence phase, including any testimony concerning medical standards of care or deviations therefrom.

The government agreed it would not solicit any opinion testimony from Dr. Craparo during the guilt/innocence phase of this trial. And it will not. However, the government made no such representation regarding medical standard of care testimony.

First of all, testimony regarding generally accepted, medical standards of care does not constitute opinion testimony. This testimony is factual in that it is premised upon what medical peer groups and organizations, such as the American Cancer Society and the American Medical Association, do or do not recommend.

Secondly, in order to explain his actions as Patient X's new primary care physician, Dr. Craparo will have to mention the universally accepted medical standard - that all women over the age of 50 should undergo an annual mammogram. Dr. Craparo will testify he immediately ordered a mammogram for Patient X after his

review of her chart at Highland Manor revealed she did not have one during the 18 months she was under Dr. Salko's care. Thus, there is no reason why Dr. Craparo should be precluded from addressing the annual mammogram standard of care in explaining his treatment of Patient X during the guilt/innocence phase of this trial.

### IX.     Salko's Medical License Suspension

The government has no intention of offering any evidence regarding the suspension of Salko's medical license during its case in chief. However, the subject may be an appropriate area of inquiry at some other point in the trial.

### X.     Salko's Personal Life

Salko asks the Court to preclude the government from offering any evidence regarding Salko's personal finances, personal and family relationships, and personal interests.

First of all, the government has no intention of offering any evidence regarding Salko's personal interests, such as hobbies, social activities, or family relationships, during its case in chief. However, Salko's personal *finances* are another matter, particularly in light of the fact the government has alleged Salko engineered a scheme to defraud Medicare out of money he was not entitled to receive. The government can not eliminate this subject as a potential area of testimony and/or evidence.

Moreover, it is conceivable a witness may be called, by either the government or the defense, who may have a bias against Salko based upon a current or prior personal or sexual relationship. Under these circumstances, inquiry into the relationship and extrinsic proof of same is appropriate under the Rules of Evidence. *United States v. Abel*, 469 U.S. 45, 51 (1984); *United States v. Ringwalt*, 213 F. Supp. 2d 499 (E.D. Pa. 2002).

### XI.    Statistical and Peer Rankings Evidence

Contrary to the defense representation, the government has no intention of offering any peer comparison evidence or testimony in this case. The government will offer two source documents, known as Ultra Reports, that detail Salko's Medicare paid claim history for Fiscal Years 2005 and 2006. The Ultra Reports do contain some peer rankings information, however, the government is only offering the Reports for the paid claim information and will not solicit any testimony regarding Salko's peer rankings. If necessary, the peer review data on the Ultra Reports can be redacted.

Neither will the government offer any "statistical analysis" other than the number of E&M claims Salko submitted to Medicare during FY 2005 and FY 2006, as more fully described in the following section of this Response.

### XII.    Improbable/Impossible Days

The government's proof at trial will show Salko regularly conducted what he referred to as "Grand Rounds" at Birch Hills, Highland Manor and other assisted

living and skilled nursing facilities in the Carbondale, PA area. Typically, Salko's visits to these facilities were made on weekends. On some trips, Salko would also see patients at hospitals or their homes. Due to the extremely large number of patients under his care, Salko did not have time to see every one. Sometimes, the only time Salko's resident patients would see him would be when Salko strolled thru their hallways or lunch rooms. And on those occasions when Salko did see a resident patient, as the Indictment alleges his "examinations" were often "cursory and superficial."

Nonetheless, such did not deter Salko from aggressively billing Medicare for Evaluation & Management (E&M) services (the traditional doctor's visit) he did not provide. In fact, Salko submitted so many claims for E & M services in FY 2005 and FY 2006 that the numbers alone prove it was physically improbable and/or impossible for Salko to have done what he claimed to have done.

For example, the government will show that during FY 2006 (Oct. 05 - Sept. 06) Salko billed Medicare for 5,923 E & M services. Of that number 2,127 were purportedly rendered in Skilled Nursing Homes and 1,730 were provided in Rest Homes (Assisted Living Facilities). *See* Govt. Exh. # 112. Salko's numbers were even higher for FY 2005. That year Salko billed Medicare for 6,453 E & M services, with more than half purportedly rendered at Skilled Nursing Homes (2,058) and Rest

18

Homes (1,633). *See* Govt. Exh. # 111. That means that for every day in FY 2006 Salko billed Medicare for an average of 16.2 E & M services. And for FY 2005, Salko's daily average was even higher, 17.6 E &M services per day.[5]

The impossibility of one physician legitimately providing this many E & M services is even clearer when one considers the CPT Code Book assigns "typical" times to many of Salko's claimed E&M procedures. For example, in FY 2005 Salko claimed he provided 1,501, #99311 E & M services to Nursing Home patients. According to the 2005 CPT Code Book, "physicians *typically* spend 15 minutes at the bedside and on the patient's floor or unit" during a #99311 E&M procedure. Govt. Exh. # 130, p. 24.(emphasis supplied).[6] Thus, if Salko spent the typical amount of time on these 1,501 # 99311 procedures, he consumed 9.38, 40 hour work weeks on

_____

[5]Salko employed other physicians, physician assistants and nurse practitioners at his Whites Crossing practice. However, Salko's FY 2005 and FY 2006 E &M claim numbers do not include services provided by his employees. Under Medicare rules and regulations, claims for Nursing Home, Rest Home, and Home Visit E&M services must be submitted under the identification number of the provider who actually rendered the service. A physician can bill Medicare for a Hospital E &M procedure that involved the assistance of a non-physician practitioner but the physician must have a face to face encounter with the patient on the date of service. A physician can also bill Medicare for an Office E & M procedure that was provided by an assistant, however, the supervising physician must be physically present within the office suite at the time of service.

[6]The most prevalent "typical time" for a Level 1, Nursing, Rest Home, Hospital, Office or Home Visit E & M Procedure, as provided by the CPT Code Books for FY 2005 and 2006, is 15 minutes.

just this particular procedure code.  *See* Govt. Exh. 111.

Multiplying Salko's total number of claimed E & M services by the times assigned to them by the CPT Code Book further demonstrates the impossible nature of his claims.  Of Salko's 6,453 E & M service claims for FY 2005, 4,811 (75%) had typical time periods assigned to them - 1,642 (25%) did  not.  Salko's 1,633 Rest Home claims account for all but 9 of the 1,642 unassigned procedures.  Govt. Exh. # 111.  Thus, without attributing any time whatsoever to Salko's substantial Rest Home billings, Salko's activities for nearly the entire  year (49.65, 40 hour work weeks) are already accounted for.  *See* Govt. Exh # 111. And this does *not* include *any* of Salko's non-Medicare, private insurance claims or any services rendered to cash paying patients.

The same is true for FY 2006.  Of Salko's 5,923 Medicare E & M service claims that year, only 3,918 (66%) had typical time periods assigned to the procedure.  In themselves, the 3,918 time assigned procedures accounted for 42.08, 40 hour work weeks. Thus, the vast majority of Salko's activities for the entire year are accounted for without even taking into consideration nearly half  (44%) of his Medicare E & M service claims.  And as was the case for FY 2005, such does *not* include *any* of Salko's non-Medicare, private insurance claims or services rendered to cash paying patients.

More importantly, these incredibly high E & M service claims are consistent with Salko's claims history on the specific dates charged in the Indictment. For example, with respect to Patient X, Salko billed Medicare for no less than 20 and as many as 60 E &M services on her charged dates. Govt. Exh. # 109. The average number of E & M services performed on each of the 8 charged dates was 39.7. With the exception of March 4, 2005, almost all of the claims were for E & M procedures that did not have typical assigned times. But on March 4, 2005, Salko's 29 timed procedures alone accounted for 13.4 hours. *Id* . That Salko was busy submitting so many E&M service claims to Medicare - 47 on June 12, 2005, 60 on July 2, 2005, and 36 on July 17, 2005 - helps explain how he inserted false progress notes into Patient X's chart at Highland Manor for those dates *after* he had been replaced as her primary care physician by Dr. Craparo on May 24, 2005.

The numerical evidence is even more startling on the Peggy Rogers charged dates. Due to changes in the CPT Code Book from the prior year, almost all of Salko's claimed E & M Procedures had typical time periods assigned to them in 2006. The results were dramatic. Salko claimed to have performed no less than 23 and as many as 57 E &M services on the Rogers charged dates. Govt. Exh. # 110. The average number of E &M services for the 9 charged dates was 33.7. Govt. Exh. # 110. More importantly, the hours attributable to time assigned E & M procedures soared. No less

21

than 10.4 hours and as many as 23.3 hours were spent on timed E & M procedures on the charged dates. The average amount of typical time was 16.1 hours. Govt. Exh. # 110.

Perhaps the most egregious example of Salko's over-billing is provided by Sunday, June 25, 2006. On that day Salko billed Medicare for 57 E & M services, 49 of which were submitted under time assigned procedure codes. The timed procedures codes *alone* account for nearly a complete day - *23.3 hours. Id.* And, as with Salko's FY 2005 and FY 2006 statistics, none of the E &M claims on the charged dates include any of Salko's non-medicare, private insurance claims or cash paying patients.

Another important factor to consider is that not all of the E & M services were provided by Salko at one location. For example, on July 2, 2005, a charged Patient X date of service, Salko claimed to have provided E&M services to 60 patients at 7 different locations throughout Northeast Pennsylvania. Govt. Exh. # 122 . The shortest drive from one location to the others has been estimated at 42 minutes. Salko spent even more time driving on June 25, 2006, a Peggy Rogers' charged date. On that date Salko billed Medicare for 57 E&M services purportedly rendered at 7 different locations. The shortest amount of driving time between these locations has been estimated at 51 minutes.

Contrary to Salko's contentions, this evidence will not unnecessarily prolong the trial nor consume days and days of direct and cross-examination. The testimony regarding Salko's E&M service claims for FY 2005, FY 2006, and the charged dates can be accomplished thru the calling of two witnesses - a Custodian of Records from Highmark to authenticate the underlying records, and a summary witness who prepared the Government Exhibits referenced above. There is no need to call any other witness or introduce any other patient's progress notes or medical records. Accordingly, the Court should not exclude this highly probative and relevant evidence from trial.

### XIII. Rogers' Hospital Photographs

The photographs taken of Peggy Rogers at the Marian Community Hospital on August 21, 2006, the day after her emergency room admission there, are also highly relevant and probative evidence in this case. The government has alleged that Salko's August 13, 2006, progress note is false because Salko represented he conducted a very detailed physical examination of Rogers on that date and found, among other things, that Peggy's breasts, skin and nails were all normal.

The hospital photographs, however, prove otherwise. Rogers had a large, open lesion on her right breast (Govt. Exh. # 35-37). Other photographs (Govt. Exh. # 39,42, and 43) depict large patches of dead skin and long, untrimmed toenails on her

23

feet. A photograph of the fluid stained brassiere Peggy wore at the time of her admission (Govt. Exh. #41) is also relevant because it tends to prove the lesion had ulcerated long before she entered the hospital.  Dr. Rene Kass relied, in part,  upon these photographs in formulating her opinion that the lesion had ulcerated the skin "for quite some time ... certainly more than a week" prior to her admission, and that Peggy's tumor was definitely palpable upon the performance of a reasonably proficient clinical breast exam as early as May 21, 2006.  *See Transcript,* Sept. 12, 2008 Daubert Hearing, p. 23. Thus, all of Peggy Rogers August 21, 2006, hospital photographs should be admitted during trial.

## XIV.  Suggestions that Salko Billed Medicare for Breast Exams

The government has no intention of suggesting to the jury that Salko billed Medicare just for Peggy Rogers' breast exams.  To the contrary, the government will present overwhelming proof that Salko repeatedly billed Medicare for E & M services he did not provide while he served as her primary care physician.

## XV.  Suggestions That Electronic Medical Records Are Unreliable

The government has no intention of suggesting during trial that electronic medical records are inherently unreliable. The government will simply prove that Salko's electronically prepared progress notes and electronically submitted Medicare claims in this case were false and fraudulent.

## XVI.  Salko's Overall Medical Care of Rogers and Patient X

Here, Salko is plainly wrong about what is alleged in the Indictment. The Indictment does not simply allege Salko's medical care of Rogers and Patient X was inadequate on the 19 charged dates.  The Health Care Fraud Counts (1 and 11) are much broader than that. These Counts allege the schemes to defraud began when Salko first became their  primary care physician and continued until after Patient X replaced Salko in May of 2005 and Rogers entered the hospital in August of 2006. The Indictment alleges that during these time periods, Salko's medical care of both Rogers and Patient X was inadequate. For example, the Indictment  alleges that while Rogers was at Salko's Birch Hills assisted living facility between  June 17, 2004 and  August 20, 2006,  Salko "spent little time with Rogers and his physical examinations of her were often cursory and superficial." Count 1, para 7. Similarly, with respect to Patient X, the Indictment alleges she was "extremely dissatisfied with the level of medical care Salko was providing her." Count 11, para 4.

Salko confuses the time periods for the *existence* of the schemes with the times when the schemes were allegedly *executed*. The Indictment alleges the Rogers scheme existed between June of 2004 and August of 2006 but was executed between May and September of 2006. Count 1, para. 6, 7, 13.  Similarly, the Patient X scheme existed between December of 2003 and July of 2005 but was executed between January and

July of 2005. Count 11, para. 2, 4, 6.   Accordingly, the government should not be

precluded from proving Salko's medical care of Rogers and Patient X was inadequate

throughout the entire time he served as their primary care physician.

### XVII.      Rogers' and Patient X's Right to Receive Competent Health Care and Medicare Benefits

Every American citizen has the right to receive reasonably competent health

care and, if qualified to do so, Medicare benefits. Just because Rogers and Patient X

did not have the financial means to pay cash for their treatment or purchase private

health care insurance does not mean they had to suffer sub-standard levels of medical

care.  This is indeed a case involving, as counsel describes it, a "two -sided" Health

Care Fraud – a scheme to defraud Medicare and obtain money he was not entitled to

receive, and a scheme to deny Rogers and Patient X a level of medical care they were

entitled to receive.  Any suggestion to the contrary ignores the clear allegations of the

Indictment.

### XVIII.      Dr. Demario's August 29, 2006 Report Re Peggy Rogers

Salko argues that any testimony about Dr. DeMario's August 29, 2006

encounter with Peggy Rogers at the Community Medical Center should not admitted

because it constitutes inadmissible hearsay.  Salko's contention is clearly misplaced.

The Federal Rules of Evidence excepts hearsay statements made ...

> for the purposes of medical diagnosis or treatment and describing medical history, *or past or present symptoms, pain, or sensations* ... insofar as reasonably pertinent to the diagnosis or treatment.

Rule 803(4)(emphasis supplied). A review of the report reveals it falls squarely within the scope of Rule 803(4). In the section of his Report entitled "History of Present Illness," Dr. DeMario recorded ...

> The patient relates to me that over ... the past *eight to nine months,* she's been having a problem, after bumping her right breast ,where she noticed on the outer aspect it began to get black then sore. At that particular point in time she had told the staff and they said it was probably a bruise and they were keeping a close eye on it, *along with her primary care doctor, who at that time was Dr. Salko. Although the area  continued to enlarge and ulcerate* ...

Govt. Exh. #133 (emphasis supplied). This medical record contributed to Dr. Kass' opinion that there was a change in Rogers' breast skin cancer was readily detectable by Salko "well before May 2006." *Id.* Indeed, Dr. DeMario's Report suggests Salko was fully aware of the bruise and did nothing about it, except to falsely report in 9 subsequent  progress notes that nothing was abnormal about Rogers breasts.

That a Lackawanna County criminal investigation may have already been underway at the time Rogers consulted with Dr. DeMario does not alter its admissibility. The statement was made to a treating physician, not a police officer. And unlike the statement in the case cited by the defense, *Leinberry v. Arnes*

*Eelectronics*, Rogers' statement described her past symptoms and was made for the purpose of diagnosis and treatment; she was not attributing fault or blame for her disease. That Salko should argue the statement should be excluded because Dr. Brady determined Rogers was incompetent is completely disingenuous, considering that in another section of his Motion in Limine, Salko asks the Court to bar the government from suggesting she *wasn't* competent.[7] For all of these reasons, Dr. DeMario's report should be admitted under Rule 803(4).

## XIX.  Government  Exhibits 16 and 34

Government Exhibits 16 and 34 are, as counsel has noted, summary exhibits admissible under Rule 1006. The charts summarize the false representations in Salko's progress notes as charged in Counts 2-10 and 12-19 and combine them with the pertinent false claims information (date of claim, Procedure Code, billed amount, and paid amount) charged in Counts 1 and 11. The charts also recite key chronological events, such as the dates when Rogers was admitted to the emergency room and the date of Patient X's mastectomy.

The 19 false progress notes and the 19 electronic claims are fairly voluminous documents, the pertinent sections of which cannot be conveniently examined or

---

[7]Salko also claims Rogers statement to Dr. Demario "conflicts with other statements attributed to Rogers." However, Salko does not identify those statements or explain how they are inconsistent.

displayed in the court room. All of the underlying documents, which are in themselves admissible, have long been provided to the defense.   As such, the charts are appropriately admitted as substantive evidence under Rule 1006.   *United States v. Duncan,* 919 F.2d 981 (5th Cir. 1990)*; United States v. Petty*, 132 F.3d 373 (7th Cir. 1997); *United States v. Pinto*, 850 F.2d 927, 935-36 (2nd Cir. 1988).   Summaries that piece together previously admitted evidence and that are admitted under Rule 1006 are evidence.  *United States v. Winn,* 948 F.2d 145 (5th Cir. 1991).  The Third Circuit has upheld the use of summaries under Rule 1006.  *See* , e.g., *United States v. Worrells*, 94 F. App'x. 927 (3d Cir. 2004); *United  States v. Syme*, 276 F.3d 131, 151 (3d Cir. 2002).  The Court has not addressed the question of whether and how to instruct the jury concerning the summaries.

In the alternative, the charts can  be properly employed by the government as demonstrative "pedagogical devices" under Rule 611(a).  As such, the charts can be published to the jury provided the jury is instructed they are not evidence. *See United States v. Bray*, 139 F.3d 1104,112 (6th Cir. 1998).

### XX.   Post- Salko Medical Care of Rogers and Patient X

Here Salko asks the court to preclude the government from referencing any treatment received by Rogers and Patient X after Salko no longer served as their primary care physician.  In response to this argument, the government incorporates and

29

relies upon Sections IV, VII and XIII of this Brief.

**XXI. Peggy Rogers and Patient X's Competency Prior to August 20, 2006**

In the final section of his Omnibus Motion, Salko asks the court to preclude the government from suggesting Peggy Rogers or Patient X were incompetent to make decisions regarding their personal or medical care *prior to August 20, 2006.* In support, Salko cites a psychiatric evaluation of Rogers performed by Dr. George Sowerby on *August 23, 2006.*

Just because one psychiatrist concluded Peggy Rogers was competent on August 23, 2006, does not conclusively establish her mental status for the prior 18 month time period. And, to the government's knowledge, no psychiatrist has *ever* opined on Patient X's competency. Thus, there simply is no basis for precluding the government from advocating any position, one way or another, regarding Rogers or Patient X's competency.

These issues appear to be important to Salko because counsel represented in Dr. Sharon Brangman's, expert witness summary that there are "references in (Patient X's) medical records that she had specifically refused mammograms." Cognetti Correspondence, August 22, 2008, p. 5. The government is unaware of any record documenting Patient X's refusal to undergo a mammogram during the time Salko served as her primary care physician. If the defense is referring to a refusal pre-dating

Salko's care, then the government hereby assets its own motion in limine, and requests this Court issue an order directing the defense not to mention the refusal in the presence of the jury inasmuch as such would be inadmissible, highly prejudicial and completely irrelevant evidence in this case.

## C.    CONCLUSION

Based on all of the above, your petitioner respectfully requests the Court deny Salko's Omnibus Motion in Limine.

Respectfully submitted,

MARTIN C. CARLSON
UNITED STATES ATTORNEY


 s/ Kim Douglas Daniel
KIM DOUGLAS DANIEL
ASSISTANT U.S. ATTORNEY
228 Walnut Street
Harrisburg, PA  17108
Phone: (717) 221-4482
Fax: (717) 221-2246
Kim.daniel@usdoj.gov
PA BAR #31038

## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | NO. 1:07-CR-0286 |
| | ) | |
| v. | ) | (Judge Caputo) |
| | ) | |
| GREGORY J. SALKO | ) | Filed Electronically |

### CERTIFICATE OF SERVICE

The undersigned hereby certifies that she is an employee in the Office of the United States Attorney for the Middle District of Pennsylvania and is a person of such age and discretion to be competent to serve papers.

That this 15th day of October 2008, she served a copy of the attached

### GOVERNMENT'S RESPONSE  IN OPPOSITION
### TO DEFENDANT'S OMNIBUS MOTION IN LIMINE

by electronic means by sending a copy to each of the e-mail addresses stated below:

Addressee:
Sal Cognettti, Jr., Esquire
Foley, Cognetti, Comerford, Cimini & Cummins
700 Scranton Electric Building
507 Linden Street
Scranton, PA 18503-1666
E-mail: salcognettijr@comcast.net


      /s/ AMANDA L. LAU
Amanda L. Lau
Legal Assistant